UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                    Plaintiff,

      v.

JOEL E. LUKE,

                   Defendant.

_____

**REPORT & RECOMMENDATION**

17-CR-6035G

## **PRELIMINARY STATEMENT**

By Order of Hon. Frank P. Geraci, Jr., United States District Judge, dated March 18, 2019, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 36).

On March 28, 2017, the grand jury returned a superseding indictment against Joel E. Luke charging him with conspiring between 2006 and March 2017 to possess with the intent to distribute and to distribute five kilograms or more of cocaine and one kilogram or more of heroin, in violation of 21 U.S.C. § 846.  (Docket # 2).  Currently pending before this Court is the government's motion to disqualify Luke's trial counsel based upon conflicts of interest.  (Docket # 31).  Also pending is Luke's motion to disqualify a government witness from testifying at trial. (Docket # 85).  For the reasons discussed below, I recommend that the district court deny both motions.[1]

---

[1] Motions for disqualification are considered non-dispositive.  *See Donatello v. Cty. of Niagara*, 2015 WL 8328845, *1 n.1 (W.D.N.Y. 2015).  Nevertheless, because this motion also seeks preclusion of witness testimony and because the factual and legal issues relating to that request and the request for disqualification are so intertwined, I proceed by report and recommendation out of an abundance of caution.

## BACKGROUND

The pending motions concern potential conflicts of interest arising from the relationship between Luke's retained counsel, James Nobles, Esq., and two witnesses the government may call to testify at trial.

I.    ## Witness 1

The government has represented that the first witness who is a subject of its pending disqualification motion (referred to herein as "Witness 1") is believed to be a friend of Luke's and, if called, is likely to be a hostile witness for the government.  (Docket ## 78 at 5; 96).  With respect to Witness 1, the government has proffered the following about the testimony the government may seek to elicit from him.  Witness 1 owns a car dealership in which Luke has invested and on behalf of which Luke attended auctions and purchased cars.  (Docket # 96).  On an unspecified date, law enforcement agents stopped and searched a vehicle and discovered multiple kilograms of cocaine secreted inside an interior compartment.  (Docket ## 78 at 5-6; 96).  Although at the time of the stop, the car was being driven by its registered owner, who was not Luke, the vehicle was connected in some manner to Luke and had been stored in a facility used by Luke.  (Docket ## 78 at 12-13; 96).  Specifically, the government represented that it believes that the vehicle was provided or sold to Luke at some time and that Witness 1 may have knowledge about that transaction.  (Docket ## 78 at 5; 96).

Witness 1's possible testimony may also include testimony concerning one of Luke's tax returns that bears Witness 1's signature as preparer, as well as an affidavit and testimony Witness 1 provided in a forfeiture proceeding in approximately 2010 involving

currency seized from Luke.  (Docket ## 78 at 6-7; 96).  According to the government, Witness 1 has since admitted that portions of the affidavit were false.  (Docket # 96).

Nobles has represented the following concerning his relationship with Witness 1. Nobles met Witness 1 during the course of his representation of a co-defendant of Witness 1 in a misdemeanor assault prosecution in 2007.  (Docket ## 73 at 17; 94 at 1).  Witness 1 and Nobles's client were both acquitted.  (Docket # 94 at 1).  Since the trial, Nobles and Witness 1 have had several phone conversations and possibly one in-person meeting to address legal questions relating to his car dealership.  (Docket ## 73 at 17-18; 78 at 8).  During those conversations, Nobles provided legal advice to Witness 1.  (Docket # 78 at 8-9).  Their last conversation occurred approximately two years ago, and Nobles does not currently represent Witness 1.  (Docket # 71 at 3).  The issues discussed during their consultations related primarily to a sales tax audit and a DMV audit of Witness 1's business, including his responses to subpoenas issued in connection with those audits.  (Docket # 78 at 8-9, 11).

According to Nobles, in response to the government's disqualification motion, he reviewed the affidavit and testimony provided by Witness 1 in the forfeiture proceeding.  (*Id.* at 10-11).  Nobles did not represent Witness 1 or Luke during that proceeding.  (*Id.*).  Based upon his review, Nobles does not believe that he knows any confidential information about the subject matter of the statements in the affidavit or the testimony provided by Witness 1.  (*Id.*).  Nobles also represented that he and Witness 1 have never discussed the forfeiture proceeding or defendant Luke.  (*Id.* at 11-12).  Nobles does not believe that he acquired any confidential or secret information during the course of his earlier privileged communications with Witness 1 that would impede his ability to cross-examine Witness 1 if he were to testify at Luke's trial.  (*Id.*).

3

II.    **Witness 2**

      The government has represented that the second witness who is a subject of its disqualification motion (referred to herein as "Witness 2") is an unindicted co-conspirator of Luke's whom the government expects to call at Luke's criminal trial to provide testimony inculpating Luke.  (Docket # 72 at 5-7).  Sometime before the return of the initial indictment against Luke in February 2017, Witness 2, accompanied by his retained attorney, Brian DeCarolis, Esq., participated in a proffer session with, among others, then-Assistant United States Attorney Frank Sherman, Esq.  (Docket # 90).  DeCarolis is, and was at the time of the meeting, a member of the two-person law firm of Nobles & DeCarolis.  (Docket # 93 at 6).  Nobles is the other member.  (*Id.*).

      During the proffer meeting, Witness 2 provided information regarding Luke.  (Docket # 90).  Witness 2 has agreed to cooperate with the government, for which Witness 2 hopes to receive a benefit from the government.  (Docket # 72 at 6).  The government anticipates that Witness 2 will testify at Luke's trial that he engaged in "significant drug trafficking activities" with Luke, including selling kilogram quantities of cocaine and providing the proceeds to Luke.  (Docket ## 72 at 5-6; 77 at 4).  The government characterizes Witness 2 as an "important" witness to the government's case.  (Docket # 72 at 6).  Witness 2 continues to be represented by DeCarolis, including in connection with his anticipated trial testimony against Luke.  (Docket ## 31 at 5; 72 at 8, 15-16).

      Nobles & DeCarolis represents itself as a two-person partnership.  (Docket # 94 at 3).  The firm's website indicates that Nobles and DeCarolis became partners in 2015.  (Docket # 93 at 6).  Nobles and DeCarolis use letterhead with the name "Nobles & DeCarolis," share

office space, and have an address, phone number, email address domain, and fax number in common. (*Id.*).

At the Court's request, DeCarolis appeared before the Court, addressed his professional relationship with Nobles, and provided information concerning their office space, shared staff and resources, and access to client files. (Docket # 72 at 12-29). DeCarolis explained that he and Nobles share a physical workspace and resources, including a secretary, with another attorney, although that attorney is not associated with their firm. (*Id.* at 18-19). Their shared secretary works at a desk on the first floor, and four attorneys' offices are located on the second floor. (*Id.* at 19-20). Nobles and DeCarolis occupy the two offices that are the farthest apart from each other. (*Id.* at 20-21).

According to DeCarolis, from his office he sometimes hears Nobles speaking, although he is unable to "derive the substance" of any communication. (*Id.* at 21-22). DeCarolis does not believe that he has ever overheard any conversations between Nobles and any of his clients. (*Id.* at 21). Both Luke and Witness 2 have been incarcerated throughout their representations by Nobles and DeCarolis, respectively, and have never been to either attorney's office. (Docket ## 72 at 25; 79 at 8).

DeCarolis represented that he and Nobles each have their own clients and work independently, with the exception of approximately six cases in which they were jointly retained to work together. (Docket # 72 at 12-13). Although they work independently, they sometimes consult each other, as they do other local criminal defense attorneys, to obtain advice on case-related issues. (*Id.* at 13-14). They each have their own physical and electronic files and do not have access to each other's files (except for those relating to the matters on which they are

jointly retained); their shared secretary has access to each of their files.  (*Id.* at 19, 22-25).
DeCarolis keeps his physical files locked in a drawer in his office.  (*Id.* at 25).

Although Nobles and DeCarolis, along with the third attorney who is not
associated with their firm, share business expenses, they do not share revenues (save for those
matters on which they are jointly retained).  (*Id.* at 23).  According to DeCarolis, payments from
his clients are deposited into his own personal business account.  (*Id.* at 24).  When a shared
expense is incurred, DeCarolis withdraws funds from his personal business account and deposits
his share of the expense into a joint account from which the expenses are then paid.  (*Id.* at
23-24).

DeCarolis represented that the law firm has an internal procedure to review for
potential conflicts.  (*Id.* at 26-28).  That procedure did not identify the potential conflict between
his representation of Witness 2 and Nobles's subsequent retention by Luke.  (*Id.*).  Although he
could not be "[one hundred] percent certain[]," DeCarolis does not believe that he and Nobles
have ever discussed with one another either Witness 2 or Luke, especially any confidential,
privileged, or secret information, beyond one "cursory," non-substantive conversation in
December 2019 acknowledging that the potential conflict issue had been identified (in which no
secret or confidential information was shared).  (*Id.* at 11-14).

Nobles confirmed DeCarolis's representations, including that DeCarolis does not
have access to Nobles's electronic or physical files, client information, finances, or calendars and
vice-versa, although their shared secretary has access to confidential case information.  (Docket
## 33-1 at ¶ 15; 72 at 56-57; 94 at 3).  He also represented that he and DeCarolis have no written
partnership or business agreement.  (Docket # 70 at 9).  According to Nobles, his business

relationship with DeCarolis is little different from the one between Nobles and the third attorney who shares a secretary and office space with them.  (Docket # 72 at 47).

After learning of the potential conflict, Nobles moved Luke's physical file to his home office.  (Docket # 33-1 at ¶ 15).  Nobles has repeatedly and consistently represented that he has never learned any confidential, secret, or privileged information about Witness 2.  (Docket ## 72 at 46; 92 at 4).  Based upon all these circumstances, Nobles maintains that he does not owe any duty of loyalty to Witness 2 and would be able to vigorously cross-examine him were he to testify at Luke's trial.  (Docket # 72 at 50-51).[2]

DeCarolis consulted with Witness 2 about the potential conflict, and on February 7, 2020, he informed the Court that Witness 2 did not join in the government's disqualification motion and was willing to waive any potential conflict.  (Docket # 95).  On February 18, 2020, the Court appointed John F. Speranza, Esq., to serve as conflict-free counsel to Witness 2 to advise him concerning the conflict issue raised in the government's motion.  (Docket # 77).  Speranza met with Witness 2, reviewed with him the government's disqualification motion and relevant caselaw, and answered his questions.  (Docket # 74 at 3).  After that meeting, Witness 2 changed his position and elected to join in the government's motion for disqualification of Nobles and declined to waive any conflict.  (*Id.* at 5-7).  Witness 2 also affirmed his continued desire to be represented by DeCarolis, his retained counsel, in connection with his criminal proceedings and cooperation obligations.  (*Id.* at 6).

---

[2]  Indeed, the Court questioned Nobles to explore whether his defense of Luke, including cross-examination of Witness 2 or arguments during summation, would be diminished at all by his relationship to DeCarolis.  (Docket # 72 at 48-51).  Nobles asserted confidently that his defense of Luke would not be affected, assuring the Court that his cross-examination of Witness 2 would be "110 percent" and that he did "not believe for one second that [he] would be softer" during the examination.  (*Id.* at 51).

III.    <u>**Procedural Background**</u>

             Although Luke was indicted in 2017, he was not arrested until two years later, and was arraigned on April 10, 2019.  (Docket # 7).  At the time of Luke's arraignment, he was assisted by a Criminal Justice Act panel attorney, but expressed his desire to retain counsel.  (Docket # 64 at 5).  Assistant United States Attorney Sean Eldridge, Esq., appeared on behalf of the government.  (Docket ## 6-7).  Eldridge had assumed prosecutive responsibility for the case following AUSA Sherman's retirement.  (Docket # 85-2 at ¶ 13).  On April 17, 2019, the government wrote a letter to an attorney whom Luke was considering retaining, Scott Green, Esq., advising him that it was not aware of any conflicts in his potential representation of Luke.  (*Id.* at ¶ 14).  A few days later, on April 23, 2019, Nobles appeared as Luke's retained counsel.  (Docket # 10).

             Over the next few months, the parties engaged in discovery and plea negotiations, and Luke filed his omnibus motions on October 14, 2019.  (Docket ## 19; 33-1 at ¶¶ 17, 19).  Despite providing approximately 7,500 pages of discovery, none of the information provided by the government contained any references to Witness 2.  (Docket ## 22 at 4; 85-2 at ¶ 19).  On November 8, 2019, the Court held oral argument on Luke's omnibus motions, at which time it directed counsel to confer on Luke's request for a bill of particulars and scheduled an evidentiary hearing for December 10, 2019.  (Docket # 68 at 17, 23-24).

             In compliance with the Court's directive, counsel met on November 22, 2019.  (Docket # 72 at 44).  During that conferral, the potential conflict of interest concerning Witness 1 was identified by Nobles and discussed with Eldridge.  (*Id.*).  Despite their discussion of the government's anticipated case against Luke, the issue of Witness 2 testifying against Luke was not discussed.  (Docket ## 72 at 44; 85-2 at ¶ 17).

The record does not establish precisely when Eldridge learned about Witness 2 and the testimony that he could provide.  Sometime after his November 22 meeting with Nobles and before the scheduled December 10 hearing, Eldridge discovered that Witness 2 was represented by DeCarolis.  (Docket # 72 at 32-33).  After discussing the potential conflict with members of the United States Attorney's Office, Eldridge called DeCarolis to inform him of the conflict.  (*Id.* at 10-11, 33-34).  DeCarolis notified Nobles of the issue, but did not have any detailed, substantive discussion of the matter.  (*Id.* at 10-11).  Eldridge and Nobles subsequently discussed the issue and agreed that they needed to alert the Court before proceeding further.  (*Id.* at 10-11, 30-31).

On December 9, 2019, Eldridge wrote the Court to request that the evidentiary hearing scheduled for the next day be converted to a status conference to discuss the potential conflict issues with both Witness 1 and Witness 2.  (Docket # 69 at 2).  At the conference on December 10, counsel identified and explained the potential conflicts issues, and the Court scheduled a further status conference for December 17, 2019, in order to permit Nobles additional time to discuss the matter with Luke.  (Docket # 69).

Prior to the December 17 status conference, the Court received a letter from Nobles advising that Luke wished Nobles to continue representing him notwithstanding the conflict issues.  (Docket # 92).  Following an additional conference on the matter, the Court requested formal submissions from counsel for both sides.  (Docket # 30).  On January 15, 2020, the government filed the pending motion for disqualification.  (Docket # 31).  After requesting and receiving information from DeCarolis, and appointing conflict-free counsel to advise Witness 2, Witness 2, as noted above, joined the government's disqualification motion and declined to waive any potential conflict.  (Docket ## 72, 74, 77).

Following oral argument on the motion, on March 4, 2020, the Court appointed Mark Foti, Esq., to serve as conflict-free counsel to Luke to advise him regarding the issues that might arise as a result of Nobles's relationships (direct or imputed) with Witness 1 and Witness 2 and to assist him in determining whether to waive any conflicts arising therefrom. (Docket ## 40, 79). The Court scheduled a conference for March 17, 2020, in order to permit Foti sufficient time to confer with Luke and to report to the Court. (*Id.*). Due largely to the COVID-19 pandemic and resulting in-person contact restrictions at the jail where Luke was detained, Foti was unable to schedule a meeting with Luke. (*See*, *e.g.*, Docket # 41). Because Luke and Foti wished to discuss the conflict issues in person, rather than by video or telephonically, Foti requested and received multiple adjournments throughout the summer of 2020. (Docket ## 41-54).

Beginning in late August 2020, the defense requested additional adjournments to conduct legal research on issues related to the motion that they had not previously explored. (Docket ## 55-56). On September 25, 2020, after consulting with Luke, Foti informed the Court that Luke continued to oppose the government's motion for disqualification of Nobles. (Docket # 57). Accordingly, the Court scheduled a *Curcio* hearing for October 16, 2020. (*Id.*).

The *Curcio* hearing was thereafter repeatedly adjourned at Luke's request; the adjournments were requested to allow him time to attempt to hire a second defense attorney who would be responsible for cross-examination and related tasks pertaining to Witness 2 – evidently, the unexplored issues referenced in August 2020. (Docket ## 59, 62, 81). Those efforts were ultimately unsuccessful, and, after informing the Court that he still wished to proceed with Nobles as his counsel, Luke filed the pending motion to disqualify Witness 2 on May 14, 2021. (Docket ## 82-85). Oral argument on Luke's motion was held on June 15, 2021, after which

10

both parties filed supplemental submissions in response to inquiries from the Court at argument. (Docket ## 89, 90, 91).

Relevant to the motion, Nobles represented that since his retention in April 2019 he has traveled to Livingston County Jail more than thirty times to meet with Luke and has spent over 200 hours working on this case.  (Docket # 85-2 at ¶ 21).  Additionally, Nobles's paralegal (who is not shared with DeCarolis) has spent over eighty hours working on it.  (*Id.*).  Nobles maintains that he has established a "vital working relationship" with Luke and that Luke has paid substantial compensation for his legal representation.  (*Id.* at ¶ 22).

## IV.    **The Parties' Contentions**

The government urges the Court to disqualify Nobles from further representation of Luke on the grounds that there exists an irrebuttable presumption of shared confidences between Nobles and DeCarolis.  (Docket # 31).  According to the government, because the firm's representation of Luke and Witness 2 is concurrent, the clients' interests are adverse to one another, and the size of the law firm is exceptionally small, the conflicts cannot be waived and disqualification is mandatory.  (*Id.* at 5-11).  In essence, the government argues that the presumption of shared confidences is not rebuttable in situations involving concurrent representation and a relatively small law firm.  (*Id.* at 10).

The government's position regarding the effect of Nobles's prior privileged communications with Witness 1 is less clear.  (*See*, *e.g.*, Docket # 93).  The government suggests that the subject of Nobles's prior consultations with Witness 1 may overlap to some degree with Witness 1's possible testimony.  (Docket # 73 at 19).  The government concedes that it has not determined whether it will subpoena Witness 1 to testify.  (Docket # 73 at 16-17).  In the

11

government's estimation, the potential conflict with Witness 1, even if waivable, would preclude Nobles from cross-examining Witness 1 with, or otherwise using at Luke's trial, any privileged or secret information he learned during the course of his consultations with Witness 1. (Docket # 93 at 4).

Luke's position with respect to Witness 1 is that Nobles's prior privileged communications with the witness are not substantially related to this matter. (Docket ## 92 at 4; 94 at 2). Although Luke concedes that Nobles would be prohibited from cross-examining Witness 1 using any confidential or privileged information he acquired during their communications, Nobles believes that he has no such information of any relevance to this matter and that any potential conflict arising from Witness 1's testimony is in any event waivable. (*Id.*).

Regarding Witness 2, Luke acknowledges that Nobles and DeCarolis are members of the same law firm and that his and Witness 2's interests are adverse. (Docket # 33-1 at ¶¶ 4, 15). He nonetheless maintains that any conflict is waivable because the record convincingly rebuts any presumption that confidences of Witness 2 were shared by DeCarolis with Nobles or that confidences of Luke were shared by Nobles with DeCarolis. (*Id.*). Luke contends that the government's motion to disqualify is a tactical one, made only after Luke had rejected the government's plea offer. (Docket ## 33-1 at ¶ 17; 85-2 at 17).

Moreover, Luke contends that the current predicament is of the government's making due to its failure to alert Nobles of the conflict at the time of his retention. (Docket # 85-2 at ¶ 4). According to Luke, any information learned by AUSA Sherman during the pre-indictment proffer session with Witness 2, including that Witness 2, who was represented by DeCarolis, had significant incriminating information about Luke, was imputed to Eldridge when he assumed prosecutive responsibilities from AUSA Sherman in June 2018. (*Id.* at ¶ 13). Luke

maintains that the government's failure to identify and disclose the potential conflict for eight months after his retention of Nobles was grossly negligent, although not willful, and warrants preclusion of Witness 2's testimony in order to prevent prejudice.[3]  (*Id.* at ¶¶ 14-15, 23).  Luke contends that the fact that the government has several other cooperating witnesses who are likely to offer damaging testimony weighs in favor of preclusion.  (*Id.* at ¶¶ 11-12).

The government opposes preclusion of Witness 2's testimony.  (Docket # 88). The government characterizes Witness 2 as an "important" witness, whose testimony is neither duplicative nor disposable.  (*Id.* at 5).  With respect to the failure to identify the conflict earlier, AUSA Eldridge represents that he alerted the parties and the Court about the potential conflict as soon as he appreciated that it existed.  (*Id.* at 7-11).  Eldridge disputes that the government alone was obligated to identify the conflict and contends that an internal conflicts check by Nobles prior to accepting Luke's representation – when Witness 2 was already a client of DeCarolis and had proffered information regarding Luke – should have identified the conflict.  (*Id.*).  Because it did not, the government should not be penalized by preclusion, the government asserts.  (*Id.*).

## DISCUSSION

### I.    Applicable Law

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  This right encompasses the privilege to select counsel of his own choosing, assuming the defendant can afford to retain counsel.  *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) ("[w]e have previously held that an element of [the right to counsel] is the right of a

---

[3] Foti, Luke's conflict-free counsel, agrees that preclusion of Witness 2 is the appropriate resolution of the issues before the Court.  (Docket # 86).

defendant who does not require appointed counsel to choose who will represent him") (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)); *United States v. Arrington*, 941 F.3d 24, 39 (2d Cir. 2019) ("[t]he Sixth Amendment right to effective assistance of counsel generally ensures that an accused may be represented by any attorney who will agree to take his case") (internal quotations omitted). Accordingly, "[a]lthough a defendant's right to counsel of his choice is not an absolute one, . . . the right of an accused who retains an attorney to be represented by that attorney is a right of constitutional dimensions[,] . . . [and] should not be unnecessarily obstructed by the court." *United States v. Perez*, 325 F.3d 115, 124-25 (2d Cir. 2003) (quotations, brackets, and citations omitted).

Also encompassed in the right to counsel is the "right to representation that is free from conflicts of interest." *United States v. Williams*, 372 F.3d 96, 102 (2d Cir. 2004) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). At times, the right to counsel with undivided loyalties may conflict with a defendant's right to counsel of his choosing and the court's interest in ensuring a fair trial. *United States v. Perrone*, 2007 WL 1575248, *2 (S.D.N.Y. 2007) ("[d]ueling Sixth Amendment rights are implicated in this case due [to] defense counsel's alleged conflicts of interest: the right to be represented by counsel of one's own choosing, and the right to a zealous attorney, uninhibited by conflicting duties to another client"). "When a defendant's right to choose the counsel he wants conflicts with the right to an attorney of undivided loyalty, the choice as to which right is to take precedence must generally be left to the defendant." *United States v. Arrington*, 941 F.3d at 39 (internal quotations omitted).

That said, "federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *United States v. Locascio*, 6 F.3d 924, 931 (2d Cir. 1993),

*cert. denied*, 511 U.S. 1070 (1994).  Accordingly, the Court has an obligation to "investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all."  *Arrington*, 941 F.3d at 39 (quotations omitted).  Moreover, "[i]f presented with a case where an attorney suffers from multiple conflicts, the district court must consider the conflicts in totality, not in isolation." *United States v. Liszewski*, 2006 WL 2376382, *5 (E.D.N.Y. 2006).  In balancing these competing interests, there is a "presumption in favor of the accused's chosen counsel, [although] such presumption will be overcome by a showing of an actual or potentially serious conflict." *United States v. Jones*, 381 F.3d 114, 119 (2d Cir. 2004); *United States v. Gehl*, 852 F. Supp. 1135, 1143 (N.D.N.Y. 1994) ("'[t]he question of disqualification therefore implicates not only the Sixth Amendment right of the accused, but also the interests of the courts in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair trial'[;] . . . [i]n balancing these competing interests, a presumption arises in favor of the accused's chosen counsel") (quoting *United States v. Locascio*, 6 F.3d at 931).

"[T]he line between actual and potential conflicts of interest is not always clear." *United States v. Lech*, 895 F. Supp. 586, 590 (S.D.N.Y. 1995).  An actual conflict exists "when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action."  *Arrington*, 941 F.3d at 40 (quotations omitted).  In contrast, a potential conflict exists where "the interests of the defendant may place the attorney under inconsistent duties at some time in the future."  *Id.* (quotations omitted).  Once a conflict – whether potential or actual – is determined to exist, the court must "determine whether the conflict is so severe as to require the attorney's disqualification or whether it is a lesser conflict that can be waived in a *Curcio* hearing."  *Id.*

"A conflict of interest, whether actual or potential, can be so serious that a rational defendant would never knowingly or intelligently desire the conflicted lawyer's representation." *United States v. Liszewski*, 2006 WL 2376382 at *3. Under such circumstances, the court is "obliged to disqualify the attorney, without regard to any waiver on the defendant's part." *Id.* Where the conflict is determined to be less severe, the court "may accept a defendant's knowing and intelligent waiver of his right to conflict-free counsel and permit the defendant to be represented by the attorney of this choice." *United States v. Perez*, 325 F.3d at 125. Absent significant concerns involving the integrity of the proceedings, courts should not "assume too paternalistic an attitude in protecting the defendant from himself." *Id.* at 126 (quoting *United States v. Curcio*, 694 F.2d 14, 25 (2d Cir. 1982)).

With these weighty considerations in mind, fully cognizant of the significant interests at stake, and without the ability to foresee how the trial will unfold, I wade into the murky waters resulting from the association between Luke's retained counsel of choice and two potential government witnesses. *See Wheat v. United States*, 486 U.S. at 162 ("[u]nfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly[;] [t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict"); *Liszewski*, 2006 WL 2376382 at *10 ("disqualification decisions, particularly when the facts present overlapping levels of potential conflicts, are difficult to make and yield inconsistent results[;] [m]oreover, . . . I am acutely aware of my obligation to permit [defendant] to proceed with counsel of his choice if at all possible") (*citing United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)).

16

## II.     <u>Witness 1</u>

I turn first to the issues presented by Nobles's prior consultations with Witness 1. As a general matter, the "[p]rior representation of a cooperating witness does not necessarily give rise to a conflict warranting disqualification." *See Liszewski*, 2006 WL 2376382 at *10; *Perez*, 325 F.3d at 127 ("lesser conflicts, such as an attorney's . . . prior representation of a trial witness, are generally waivable"); *United States v. Perrone*, 2007 WL 1575248 at *9 ("[o]ther cases make clear that the contention that a lawyer can never question a former client on *any* subject matter or question his credibility in argument proves too much[;] . . . there are several cases where counsel has been allowed to continue despite prior representation of a government witness") (collecting cases).  The main risk facing a defendant whose counsel previously represented a witness called by the government is that his counsel's ability to vigorously cross-examine the witness may be limited by the attorney's ethical obligations to his former client.  *See United States v. Lussier*, 71 F.3d 456, 462 (2d Cir. 1995) ("[w]hen a defense attorney cross-examines a former client who is a witness against the defendant, a conflict of interest may exist; absent a waiver from the former client, the attorney cannot inquire into privileged matters"), *cert. denied*, 517 U.S. 1105 (1996).  This quandary is intensified when the previous representation involved a matter substantially related to the pending prosecution; in those circumstances, a greater likelihood exists that the attorney will possess privileged or confidential information acquired during the previous representation that will be relevant but off-bounds to him during cross-examination of the witness/former client.  *Liszewski*, 2006 WL 2376382 at *10 ("the majority of cases that have found a conflict of interest from prior representation of a witness involve substantially related representations, where the danger of divided loyalties or revealing client confidences is at a maximum") (quotations omitted).

17

Nobles concedes that during the course of his previous consultations with Witness 1 he acquired confidential and privileged information from Witness 1. The gravity and scope of the potential conflict arising from Nobles's prior privileged communications with Witness 1 is shaped by several considerations: namely, that the government is uncertain whether it will subpoena Witness 1 to testify; that Witness 1, if subpoenaed, will likely be a hostile witness; and, that Witness 1 does not appear to be a key government witness. *See*, *e.g.*, *Liszewski*, 2006 WL 2376382 at *11 ("there is no indication that [the prior client] would be a key witness against [the defendant] such that [the attorney's] conflict might significantly compromise [the defendant's] defense"). Moreover, although Nobles provided legal advice to Witness 1 concerning his car dealership business, and the government has generally identified Luke's involvement with the dealership as a potential subject of the witness's testimony, Nobles's advice pertained to government audits. It is unclear the extent to which, if at all, any privileged or confidential information acquired by Nobles during the course of his provision of advice to Witness 1 about the audits would be implicated by Witness 1's trial testimony. In addition, Nobles has reviewed Witness 1's previous affidavit and testimony submitted in connection with the forfeiture proceeding involving currency seized from Luke – another potential subject of testimony by Witness 1 – and represented that he does not possess any privileged or confidential information regarding that proceeding. Finally, Nobles represents that he was never formally retained by Witness 1.[4] (Docket # 94 at 1). Rather, his interactions with Witness 1 were limited

---

[4] Specifically, Nobles stated:

> We never had a formal retainer agreement. I never represented him in a particular case[,] but I think that the law would be pretty clear that, given our conversations, and the fact that I provided him advice whether or not I was compensated that, yes, we had an attorney-client relationship, as limited as that may be.

(Docket # 73 at 18).

to a handful of telephone consultations (and possibly one meeting), the last of which occurred at least two years ago.

In sum, although the specific content of Witness 1's testimony is unclear, it does not appear that Witness 1 would be a "key" witness or that his testimony would be substantially related to the issues on which Nobles previously provided legal advice to Witness 1.  *See Liszewski*, 2006 WL 2376382 at *11 ("[a]t this time, there is no indication that [the witness] would be a key witness against [the defendant] such that [counsel's] conflict might significantly compromise [the] defense; [i]n addition, there has been no showing that [the attorney] possesses privileged information [learned during the substantially unrelated representations] that would implicate the attorney-client privilege were [the prior client] to take the stand"); *United States v. Pizzonia*, 415 F. Supp. 2d 168, 178 (E.D.N.Y. 2006) ("[l]imited representation of a government witness unrelated to representation of the defendant is not likely to present a disabling conflict"). On this record, I cannot conclude that the potential conflict posed by Nobles's prior privileged communications with Witness 1 is so severe that Luke "could not rationally, knowingly or intelligently desire [Nobles's] representation."  *See Liszewski*, 2006 WL 2376382 at *11.  Rather, I find that any potential conflict arising from the possibility that Witness 1 will be subpoenaed by the government to testify in Luke's trial is waivable by Luke and, assuming that he does so during a subsequent *Curcio* hearing,[5] does not warrant Nobles's disqualification.  *See Arrington*, 941 F.3d at 41 (conflict was potential where "it was not clear that [the witness] would testify or

---

[5]  Should the government decide to subpoena Witness 1, the district judge of course may consider whether to conduct an inquiry of the witness at that time to determine if he wishes to waive any potential conflict.  I do not see the need to do that now where the record supports the findings that the matters are not substantially related and that Nobles does not believe that he learned privileged or confidential information during the course of his communications with Witness 1 that would be implicated in any cross-examination of Witness 1 at Luke's trial, and where this Court will conduct a *Curcio* inquiry of Luke to determine if he knowingly and voluntarily waives the risk that Nobles's examination of Witness 1 may be limited by constraints arising from his prior attorney-client consultations with Witness 1.

what he would say if he did" and waivable where attorney would be "barred from using the fruits of [previous] representation [of witness] to benefit [defendant] or from fully cross-examining witness[] about related events"); *United States v. Cunningham*, 672 F.2d 1064, 1073 (2d Cir. 1982) ("[defendant] has demonstrated that he adequately perceives the circumstances and that he is willing to have circumscribed whatever right he might otherwise have to a fuller cross-examination of the [cooperating witness], in order to retain [the attorney who previously represented the witness] as his counsel[;] . . . if [defendant's] right to counsel of his choice conflicts with his right to an attorney of undivided loyalty, . . . the choice as to which right is to take precedence should be left to [defendant]"); *United States v. VanHoesen*, 2007 WL 2089692, *7 (N.D.N.Y. 2007) (disqualification of attorney who had previously represented six government witnesses denied where defendant waived conflict; "[t]he conflicts at issue are those arising from [defendant's attorney's] past representations and most are now many years past[;] [t]hese conflicts are of a nature that frequently occurs in criminal cases and can generally be adequately resolved by a knowing and intelligent waiver"); *Perrone*, 2007 WL 1575248 at *8, *10 (conflict waivable where defendant's attorney previously represented government witness on substantially unrelated matters); *Liszewski*, 2006 WL 2376382 at *11 (attorney's prior representation of government witness did not create an unavailable conflict of interest).

### III.    <u>Witness 2</u>

Turning now to Witness 2, there is no question – and, indeed, the parties agree – that the matters are substantially related and that DeCarolis would be precluded from simultaneously representing both Witness 2 and Luke.  Rather, the salient questions presented for the Court are whether DeCarolis's conflict should be imputed to Nobles by virtue of their

firm relationship and, if so, whether Luke is able to waive the imputed conflict. The parties also dispute the appropriate resolution of the conflict issue: namely, whether to disqualify Nobles or permit him to continue representation following an appropriate *Curcio* inquiry of Luke, or to preclude Witness 2 from testifying at Luke's trial. I address these issues below.

 A. <u>Preclusion of Witness 2's Testimony</u>

  I turn first to Luke's contention that preclusion of Witness 2's testimony is the appropriate resolution of the inherent problems arising from the simultaneous representation of Witness 2 and Luke by DeCarolis and Nobles, respectively. As noted above, Luke maintains that the government possessed the factual information necessary to identify the conflict at the time that Nobles was retained in April 2019. (Docket # 85). According to Luke, its failure to identify and alert Nobles and DeCarolis of the conflict until December 2019, approximately eight months later, amounted to gross negligence that warrants preclusion of Witness 2's testimony. (*Id.* at ¶ 23). The government disagrees, contending that the blame for failing to identify the conflict rests with Nobles and DeCarolis, not the government. (Docket # 88 at 9-12). Additionally, the government asserts that Witness 2's testimony is important to its case and that preclusion is unwarranted on these facts. (*Id.* at 3-7).

  Although conflicts arising from an attorney's prior representation of a government witness are not uncommon, what is uncommon is the length of time that the conflict here went undiscovered. Based upon the record that has been developed through these proceedings, I find that the failure is properly attributable to both the government and the defense. While Eldridge did not inherit the case until sometime in 2018, he is charged with the knowledge held by his predecessor – specifically, that Witness 2 proffered information implicating Luke in substantial narcotics activity and that the witness is represented by DeCarolis. The government had a

21

responsibility to employ steps to identify the conflict and report it to opposing counsel and the Court at the time Nobles was retained as counsel for Luke. *See United States v. Lech*, 895 F. Supp. at 593 ("the failure of the United States Attorney's Office to have a procedure in place to check who has represented cooperating witnesses, confidential informants, and co-defendants in other proceedings costs a great deal to defendants, their counsel, and the [c]ourt").

DeCarolis possessed the same information that should have led to the prompt identification of the conflict issue. Of course, an attorney representing a client in a proffer session may not always be in a position to specifically identify the individuals about whom his client provides information or assess the importance of that information to the government. Here though, that does not appear to have been the case. Considering the government's representations regarding the importance and substance of Witness 2's anticipated testimony, the reasonable inference is that DeCarolis was on notice from the time of the proffer that Witness 2 had implicated Luke and might be called to testify against him; DeCarolis has not indicated to the contrary. DeCarolis should have implemented a screening mechanism following the proffer that would have flagged the potential conflict for Nobles when Luke sought to retain him.

Despite failures by both sides, Luke urges the Court to eliminate the problem by striking Witness 2's testimony. There is little question that Luke faces significant prejudice if his retained counsel is disqualified from representing him. The two have fostered a close attorney-client relationship, and it is clear to this Court that Nobles, an exceptionally well-respected and skilled defense attorney, is Luke's preferred choice to defend him against the serious charges he faces. Additionally, Nobles has invested a substantial amount of time meeting with Luke and reviewing the voluminous discovery produced by the government.

Of course, the prejudice to Luke must be weighed against the prejudice to the government if Witness 2 were to be precluded from testifying.  Although Luke characterizes Witness 2 as a cumulative and unimportant witness, the government's submissions establish the opposite.  Witness 2 is expected to provide testimony directly implicating Luke in the narcotics conspiracy with which he is charged, namely, the distribution of kilogram quantities of cocaine and receipt of proceeds from those sales.  Weighing the competing interests, and considering the shared responsibility for the late identification of the conflict, I find that preclusion of Witness 2's testimony is not warranted.  *See Lech*, 895 F. Supp. at 593 ("I cannot say, on the record before me, that the conduct of the United States Attorney's Office in this case is so egregious that the drastic remedy of precluding a central witness's testimony is warranted").  *See also United States v. Messino*, 181 F.3d 826, 831 (7th Cir. 1999) ("although regrettable, the[] consequences [to the defendant of disqualifying his appointed counsel] clearly do not outweigh the probative value of [the witness's] testimony[,] . . . [and] the district court abused its discretion by barring [the witness's] testimony in order to resolve [the defense attorney's] conflict of interest"); *United States v. Sablan*, 176 F. Supp. 2d 1086, 1090 (D. Colo. 2001) (denying motion to strike witness in order to resolve conflict; "defendant . . . failed to develop evidence or present authorities to justify striking [the witness][;] [t]he evidence before the [c]ourt indicates that [the witness's] testimony is highly probative and not cumulative[,] . . . [and] to strike [the individual] as a witness before a trial on the merits would be an abuse of this [c]ourt's discretion").

### B.    <u>Imputation of the Conflict and Waiver</u>

The ethical rules governing attorneys generally preclude, except in limited circumstances, the concurrent representation of clients with adverse interests.  *See*, *e.g.*, 22

N.Y.C.R.R. 1200.07, Rule 1.7.  As the parties acknowledge, strict application of these rules

would prohibit Nobles and DeCarolis from simultaneously representing both Witness 2 and

Luke.[6]  (Docket # 72 at 42).  The parties also agree that because Nobles & DeCarolis hold

themselves out to the public as a firm, they are regarded as a firm under the ethical rules.  (*See*

Docket ## 31 at 5; 33-1 at ¶ 4; 93 at 5 (citing 22 N.Y.C.R.R. 1200.0, Rule 1.0(h))).  Finally, the

ethical rules provide that an attorney's conflicts are generally imputed to all other attorneys in a

firm.  *See* 22 N.Y.C.R.R. 1200.10, Rule 1.10.

Relying primarily on these ethical rules and civil caselaw, the government urges

that because Nobles & DeCarolis is a small firm that seeks to concurrently represent divergent

interests, an irrebuttable presumption of shared confidences between DeCarolis and Nobles

arises that precludes Nobles from representing Luke in this matter.  (Docket # 31 at 6-10).  The

deficiency in the government's position – and the principal reason that I reach a different

conclusion – is that it overlooks or minimizes the magnitude of Luke's Sixth Amendment right

to counsel of his choosing.  Indeed, although conflicts arising in civil litigation may provide

thoughtful guidance, "disqualification in the civil context" is distinguishable from the criminal

context because "no Sixth Amendment implications arise," and the relevance of such authority is

diminished, "particularly . . . in light of . . . Second Circuit criminal disqualification cases."  *See*

*United States v. Gehl*, 852 F. Supp. at 1147.  Further, although ethical rules may guide the

analysis, "[a]s often stated within this Circuit, the New York State Code of Professional

Responsibilities only serve[s] as a guideline."  *Adams v. Vill. of Keesville*, 2008 WL 3413867,

*12 (N.D.N.Y. 2008) (citing *NCK Org. Ltd. v. Bregman*, 542 F.2d 128, 129 n.2 (2d Cir. 1976));

---

[6]  The government has suggested that the conflict at issue here is not waivable because "it involves the assertion of a claim by one client against another client in the same litigation," in violation of Rule 1.7(b)(3) of the New York Rules of Professional Conduct.  (Docket # 72 at 63-64).  For the reasons previously indicated on the record, I disagree that the conflict in question falls within this subsection.  (*Id.* at 64-65).

24

*see Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) ("such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification").

It is well-settled that "[a]n attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated' attorneys share client confidences." *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d at 133. Nevertheless, the "presumption of shared confidences may be rebutted under appropriate circumstances to avoid indiscriminate and mechanical application of the disciplinary rules." *Stratton v. Wallace*, 2012 WL 3201666, *4 (W.D.N.Y. 2012). In evaluating such conflicts, courts consider: 1) whether an attorney is 'associated' with the firm and 2) whether the presumption of shared confidences is adequately rebutted. *Maricultura Del Norte, S. de R.L. de C.V. v. Worldbusiness Cap., Inc.*, 2015 WL 1062167, *13 (S.D.N.Y. 2015); *Hempstead Video, Inc.*, 409 F.3d at 134 ("we examine [the attorney's] situation under both the first and second steps of the traditional framework, cognizant of the interrelationship between the two in the case before us"). Relevant factors include the "significance of the prohibited lawyer's involvement in and knowledge of the client's confidences[,] . . . the size of the firm, . . . physical or technological separation and any other circumstances that might affect the risk of disclosure of confidential information, whether intentional or inadvertent." *Stratton v. Wallace*, 2012 WL 3201666 at *4. Of course, where the firm is smaller (either in physical space or number of attorneys) or where there is greater shared access to client files, the risk of shared confidences – particularly inadvertent ones – is higher. *See United States v. Kwiatkowski*, 2014 WL 2945735, *4 (W.D.N.Y. 2014) ("[w]here . . . [an] attorney formerly worked in a small law firm characterized by a certain informality and conducive to constant cross-pollination and a cross current of discussion and ideas among all

25

attorneys on all matters which the firm handled, there will be a greater likelihood of acquiring material client confidences") (internal quotations omitted); *Filippi v. Elmont Union Free Sch. Dist. Bd. of Educ.*, 722 F. Supp. 2d 295, 307-308 (E.D.N.Y. 2010) ("[a]lthough the presumption that client confidences are shared within a firm may certainly be rebutted, the presumption is much stronger within a small firm than a large firm").  Nevertheless, "[t]he outcome of any disqualification motion is so fact dependent . . . that even the slightest factual distinction can have a significant impact on the outcome."  *Gehl*, 852 F. Supp. at 1149.

Although DeCarolis and Nobles represent themselves to the public as a two-partner firm, the record demonstrates that the actual relationship between Nobles and DeCarolis lacks several hallmarks of a typical firm relationship or partnership.  For instance, they do not have a written partnership agreement and do not share business revenues.  They each have their own clients and deposit payments from those clients into separate, individually controlled business accounts.  Although they have some shared business expenses, they pay for those expenses by depositing funds from their individual accounts into a joint business account from which the expenses are paid.  Moreover, another attorney in their office space also shares a legal secretary with Nobles and DeCarolis.  That attorney is not associated with the firm but shares the office and secretarial expenses by depositing funds into the joint account.

With the exception of how DeCarolis and Nobles portray their association to the public,[7] their relationship is little different from the relationship between Nobles or DeCarolis and the third attorney who shares their office space.  In other words, the actual relationship

---

[7] In view of the difficult and close issues presented by the disqualification motion, Nobles and DeCarolis are urged to consider clarifying their professional relationship, perhaps with the assistance of business counsel, particularly as it is portrayed to the public.  If, in fact, their association is not a partnership, any statements to the contrary should be modified.  In my view, though, even if that were true, that fact alone would neither be a basis for nor a basis against disqualification in this case.

between Nobles and DeCarolis functions more like an association of attorneys who share business space and secretarial services than partners in a law firm. *Cf. Ventry v. United States*, 2011 WL 2471390, *7 (W.D.N.Y. 2011) ("[t]he evidence shows that both attorneys were, at the time, each acting as sole practitioners who shared office space and certain mutual office expenses[;] [n]either had access to the other's files, computer, bank accounts or clients[;] [t]hey did not share fees"); *Anwar v. United States*, 648 F. Supp. 820, 827 (N.D.N.Y. 1986) ("[t]he general rule in this Circuit is that in the absence of evidence that two attorneys are partners and that their interests overlap generally in the acceptance of clients and in the sharing of fees, a mere showing that 'they worked in close physical proximity, that they shared an office and perhaps a secretary,' by itself, is 'an insufficient basis on which to erect the claim of conflict of interest'") (*quoting United States v. Badalamente*, 507 F.2d 12, 21 (2d Cir. 1974), *cert. denied*, 421 U.S. 911(1975)), *aff'd*, 823 F.2d 544 (2d Cir. 1987).

Assuming, as I believe I must, that the relationship between DeCarolis and Nobles qualifies as a law firm under the ethics rules, the particular facts of this case demonstrate little actual risk of shared confidences – the primary concern underpinning the imputation rules. Of course, it is only reasonable to assume that DeCarolis, through his longstanding representation of Witness 2, including during the proffer session implicating Luke, has acquired privileged and confidential information regarding his client. Further, the law firm of Nobles & DeCarolis is unquestionably small – encompassing two attorneys, one shared secretary, and a small physical space shared with several other attorneys not associated with the firm.

Despite the small firm size, however, neither Nobles nor DeCarolis routinely shares client confidences with one another and neither has access to the other's physical or electronic files. Although they consult each other on legal issues from time to time, those

27

consultations are similar to ones they have with other local attorneys who practice criminal defense. Moreover, although the physical space they occupy is small, their offices are on opposite sides of the floor, and they do not routinely overhear the substance of each other's discussions with clients. Significantly, except for those few matters on which they are jointly retained, they do not share profits of their representations with one another.

Perhaps most importantly, each attorney has represented to this Court his belief that Nobles has not obtained knowledge of any privileged or confidential information relating to Witness 2. Apart from a brief discussion acknowledging the existence of the potential conflict when it was first discovered by Eldridge, neither attorney recalls any discussion between them regarding Witness 2 or Luke – much less a substantive one in which any confidences were revealed. Since discovering the conflict, Nobles has moved Luke's physical file to his home office, and the attorneys are acutely aware that they may not discuss this matter with one another. I find credible Nobles and DeCarolis's representations regarding the operation of their professional relationship, the absence of any routine practice of sharing client confidences, the absence of shared access to one another's client files, the absence of profit sharing, their representations that they do not believe that they have ever had any discussions with the other about their clients Witness 2 and Luke, and their understandings that they must be vigilant to avoid doing so in the future. *See Gehl*, 852 F. Supp. at 1149 ("[a]s an officer of the court, [the attorney] repeatedly stated, in one form or another, that he does not possess any privileged information regarding either [witness][;] . . . [t]he court has no reason to doubt [the attorney's] veracity").

Considering these unique facts, as well as the fact that Nobles had represented Luke for nearly eight months before the conflict was brought to his personal attention, I do not

28

find that DeCarolis's conflict should be imputed to Nobles so as to automatically disqualify Nobles from further representation of Luke.  *See United States v. Kwiatkowski*, 2014 WL 2945735 at *6-7 (finding the presumption of shared confidences rebutted where "the possibility that either [attorney] ha[s] or will gain significant confidential information is minimal"); *Brown v. City of Syracuse*, 2013 WL 2445050, *3 (N.D.N.Y. 2013) (presumption of shared confidences rebutted despite only four attorneys in the firm; "[a]lthough there is a presumption of shared confidences, especially in small law firms[,] . . . [p]laintiff has rebutted this presumption"); *Lech*, 895 F. Supp. at 590-91 ("[t]he instant conflict of interest arises solely from the fact that attorneys from the same office . . . represented [the witness] and [the defendant;] . . . [w]hile the importance of protecting client confidences and of not having one organization represent potentially adverse interests cannot be diminished, in light of the facts revealed at the hearing and the unique circumstances of this case, automatic[] disqualif[ication] . . . is fundamentally unfair").  *But see United States v. Daugerdas*, 735 F. Supp. 2d 113, 116 (S.D.N.Y. 2010) (finding disqualification warranted; "[t]his case presents the unusual circumstance of a law firm seeking to simultaneously represent a defendant and a cooperating witness in the same criminal proceeding").  Rather, given the relationship of trust that has developed between Nobles and Luke during the course of the representation, as well as Nobles's knowledge of Luke's case and the charges against him, I find that a rational defendant in Luke's position could knowingly and intelligently desire to continue with Nobles's representation.  *See Lech*, 895 F. Supp. at 592 (considering various factors including attorney's close relationship with defendant and familiarity with the case and the time it would take to permit a new attorney to learn the case, defendant "could rationally choose to continue with [potentially conflicted attorney's] representation").

In making this finding, I am keenly aware of the important interests at stake: Luke's constitutional interests in proceeding with counsel of his choosing to defend against the serious felony charge he faces; Witness 2's interests in fulfilling his cooperation obligations without risk that confidential or privileged information shared by him with his counsel will be used against him; and, the public's interests in ensuring and preserving the integrity of the judicial system.  The Court has held several proceedings to carefully develop the factual record necessary to resolve the thorny issues presented by the pending motions.  That record development – which is reflected in the transcripts of the various proceedings conducted by the Court – and this decision carefully and transparently explain the Court's reasoning in determining that automatic disqualification of Nobles is not warranted, despite the simultaneous representation of Witness 2 by DeCarolis and Luke by Nobles.[8]  *See United States v. Cunningham*, 672 F.2d at 1073 ("we believe the integrity of the system is adequately preserved by the public record in this case[;] . . . we believe the integrity of the system will best be served by not permitting the government to secure the disqualification of counsel who has represented [defendant] for such an extensive period").

The fact that Witness 2 has joined in the government's disqualification motion and declined to waive any potential conflict weighs significantly in the analysis. Unquestionably, Witness 2, as a cooperating witness, has a strong interest in being assured that his privileged and confidential communications do not become public without his consent or waiver.  *Gehl*, 852 F. Supp. at 1146 ("[a]s part of this balancing process[,] the court must also take into account the government's interest in protecting its witnesses from tactics that are unfair") (internal quotations omitted).  As explained above, the facts here establish a minimal,

---

[8]  In order to minimize any jury confusion, the district court may want to consider measures at trial to exclude or redact mention of the firm's name in testimony or in documents admitted into evidence.

almost negligible, risk that Nobles has or will acquire any confidential or privileged information relating to Witness 2.  That risk, in my estimation, is insufficient to overcome Luke's Sixth Amendment right to proceed with counsel of his choosing and the prejudice to him that would result if Nobles were to be disqualified at this stage of the litigation.  *See id.* at 1147 ("while it might be tempting at first glance to conclude . . . that [defendant's attorney] should be disqualified because he might have been privy to confidential information . . . , the court cannot take such a simplistic approach to this motion which, perhaps more than any other, so greatly [a]ffects these defendants").

Indeed, the substantial prejudice to Luke presented by Nobles's disqualification, including the loss of highly skilled and respected counsel, work product, time, and money invested to date, weighs heavily in the Court's consideration of the appropriate resolution of these motions.  Apart from the very small risk that there have been or will be any confidential client disclosures between DeCarolis and Nobles, nothing in the record suggests that Nobles's vigorous defense of Luke will be affected, let alone diminished, by the fact that DeCarolis represents Witness 2.  Considering Luke's constitutionally protected interest in selecting his own defense counsel, the extremely limited risk of disclosed confidences, and the potential prejudice to Luke if he is forced to relinquish counsel of his choice at this stage of the litigation, I conclude that disqualification of Nobles is not warranted.  *See Perrone*, 2007 WL 1575248 at *10 ("[b]ased on [defendant's] knowing waiver, his clear desire to maintain his current attorneys, and their familiarity with the subject matter of the trial, combined with the [c]ourt's conclusion that [the witness's] testimony will not require cross-examination about any . . . allegedly privileged matters, . . . the [c]ourt denies the government's motion to disqualify [defense counsel]"); *Gehl*, 852 F. Supp. at 1148 ("[g]iven the record as it is presently constituted, . . . and exercising the

substantial latitude given to it when considering a motion to disqualify in the criminal context,

. . . the court finds that [the defendant] is entitled to continue in this case with his chosen

counsel") (internal quotations and citation omitted).

             Of course, Nobles's continued representation of Luke is conditioned upon Luke's

knowing, intelligent, and voluntarily waiver of the conflict issues with both Witness 1 and

Witness 2.  *See Kwiatkowski*, 2014 WL 2945735 at *6 (defendant "expressed his understanding

that he has a right to conflict-free representation and the effective assistance of counsel," and he

"knowingly, intelligently and voluntarily waived any perceived or potential conflict of interest");

*Perrone*, 2007 WL 1575248 at *10 (defendant knowingly waived right to conflict-free counsel

where attorney's cross-examination of witness was limited to public information); *Lech*, 895

F. Supp. at 592 ("[defendant] must make a knowing and intelligent waiver of the potential

conflict of interest").  Accordingly, the Court is scheduling a *Curcio* hearing for July 28, 2021, at

2:00 p.m.  The Court's appointment of conflict-free counsel for Luke will remain in place

through the conclusion of the *Curcio* hearing.  Should Luke determine through that inquiry that

he wishes new counsel, or should the Court determine that his waiver is not knowing, intelligent,

or voluntary, the Court will substitute new counsel for Nobles.  Further, if Luke wishes new

counsel and cannot afford to retain a new attorney, counsel will be appointed for him.  At this

juncture, I am simply concluding, contrary to the government's position, that the conflict issues

brought to the Court's attention do not warrant automatic disqualification but may be knowingly

and voluntarily waived by the defendant.

             As a final matter, Nobles and DeCarolis have acknowledged their ongoing

obligations to avoid sharing any confidences belonging to either Witness 2 or Luke with one

another.  *Kwiatkowski*, 2014 WL 2945735 at *7 (directing counsel "to adhere to the screening

mechanisms put into place and to ensure that neither [attorney] inadvertently obtain[s] confidential information"). In the unlikely event that, despite all the safeguards in place, either attorney inadvertently discloses or acquires privileged or confidential information about the other's client, he must immediately inform the Court of that fact. Substitution or disqualification of counsel may be revisited in that event.

## <u>CONCLUSION</u>

For the reasons stated above, I recommend that the district court deny the government's motion for disqualification of Nobles (Docket # 31) and Luke's motion to preclude testimony from Witness 2 (Docket # 85). A *Curcio* hearing shall be conducted by this Court on **July 28, 2021**, at **2:00 p.m.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      July 22, 2021

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[9]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

_____
    *s/Marian W. Payson*
    MARIAN W. PAYSON
    United States Magistrate Judge

Dated: Rochester, New York
    July 22, 2021

---

[9]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).